STATE, Respondent, v. GLEASON, Appellant.

No. 9370.
Submitted May 17, 1954. Decided July 16, 1954.
Rehearing denied December 20, 1954.
277 Pac. (2d) 530.

486

Messrs. Shallenberger & Paddock, Mr. William F. Shallenberger, Mr. D. A. Paddock, Missoula, Mr. Donald A. Wolf, Joplin, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Leif Erickson, Sp. Asst. Atty. Gen., Mr. Edward Schroeter, County Atty., Kalispell, for respondent.

Mr. Shallenberger, Mr. Wolf and Mr. Erickson argued orally.

MR. JUSTICE ANDERSON:

John Gleason has appealed from a judgment of conviction on a charge of violating Chapter 37 of the Laws of 1937, section 66-1701 et seq., R. C. M. 1947, said Act being commonly known as the Photographic Examiners Act.

The sole question is whether or not the Act is constitutional.

Appellant relies on the authority of decisions from sister states and of territories wherein the same or similar acts have been held unconstitutional. See Arizona—Buehman v. Bechtel, 1941, 57 Ariz. 363, 114 Pac. (2d) 227, 134 A. L. R. 1374; Florida—Sullivan v. DeCerb, 1945, 156 Fla. 496, 23 So. (2d) 571; Georgia—Bramely v. State, 1939, 187 Ga. 826, 2 S. E. (2d) 647; Hawaii—Territory v. Kraft, 1935, 33 Hawaii 397; North Carolina—State v. Ballance, 1949, 229 N. C. 764, 51 S. E. (2d) 731, 7 A. L. R. (2d) 407, overruling State v. Lawrence, 1938, 213 N. C. 674, 197 S. E. 586, 116 A. L. R. 1366, certiorari denied 305 U. S. 638, 59 S. Ct. 105, 83 L. Ed. 411; North Dakota—State v. Cromwell, 1943, 72 N. D. 565, 9 N. W. (2d) 914; Tennessee—Wright v. Wiles, 1938, 173 Tenn. 334, 117 S. W. (2d) 736, 119 A. L. R. 456; Virginia—Moore v. Sutton, 1946, 185 Va. 481, 39 S. E. (2d) 348.

A Legislative Act is presumed to be valid and its constitutionality will not be condemned unless its invalidity is shown beyond a reasonable doubt. However when it is that the Act violates a constitutional guaranty, courts will pronounce the Act void. State v. Gateway Mortuaries, Inc., 87 Mont. 225, 287 Pac. 156, 68 A. L. R. 1512; Gas Products Co. v. Rankin, 63 Mont. 372, 207 Pac. 993, A. L. R. 294.

The respondent expresses the view that there are two lines of authority as to the extent of the police power of the states, one being that which is expressed in the decisions above cited from sister states and a territory, which as respondent says, holds that no profession, otherwise lawful, may be regulated unless it directly affects the public health, safety or morals, or the profession or business is one affected with public interest.

The other view, as respondent says, is that the legislature may, in the exercise of the police power, regulate and license professions and occupations not otherwise unlawful so long as the exercise of the police power is not arbitrary or capricious and the means adopted for regulation are reasonably consistent with the ends sought to be obtained. Citing Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, as authority for the latter view. Apparently respondent's view is that courts no longer may review the reasons for the need of invoking the police power and that the wisdom behind such invocation is left solely to the legislature.

If we are to assume that a distinction in the cases exists, nonetheless, before the legislature can invoke the police power of the state there must be fair reason for the law that would not require with equal force its extension to others whom it leaves untouched. State v. Safeway Stores, Inc., 106 Mont. 182, 76 Pac. (2d) 81. Unless there is something in the nature of the occupation which calls for the exercise of the police power of the states, its purported use by the legislature is without constitutional favor.

While it is true that the police power of the state has an ever widening horizon it is equally true that its exercise is still under the control of the principles of constitutional law and is subject to review by the courts. The Nebbia Case, supra, broadened the horizon but did not relinquish the subject of review as is apparently contended by respondent. ''This case [Nebbia Case] does not announce the rule that a state legislature may pass any kind of regulatory law for any kind of business or occupation under the police power but, on the contrary, conditions the exercise of such power with the limitation that it must not be arbitrary or discriminatory.'' Buehman v. Bechtel, 57 Ariz. 363, 114 Pac. (2d) 227, 231, 134 A. L. R. 1374.

We hold that the Act here in question is arbitrary and capricious and the only basis for the consistent reason of an end sought to be obtained is that of creating a monopoly for those

persons fortunate enough to be included within the formula of the Act itself.

In State v. Harris, 216 N. C. 746, 6 S. E. (2d) 854, 861, 128 A. L. R. 658, it was there pointed out as it is here that the tendency of the courts in recent years was to accept the legislative mandate without question. The court there speaking of this contention said:

"It is the fault of the argument, not of its candid restatement, if it falters at critical points. Under it there is not a calling or trade, however simple and harmless, that may not be preempted and monopolized by the first group that stakes out its claim and raises over the camp the 'keep off sign'. If the court should adopt a theory of that sort it cannot thereafter hope to protect the rights of any man under these constitutional provisions from the grossest aggression.

"Those who are versed in the history of this expression ('clothed with a public interest') will understand our disinclination to make the rights either of society or the individual to depend on a play upon words. Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236. There are many social and public interests which logically form no basis for police interference with private business or for withdrawing the protection of constitutional guaranties. Society is always interested in the trades and occupations which underlie it; there is a social interest arising from the mutuality of patronage and service; and there are many situations in the social complex that may create a desire on the part of one group to improve the conditions of contact and pressure with another, none of which as social or public interest is comparable with the importance of the social interest involved in the maintenance of personal liberty guaranteed by the Constitution. Tyson & Bro. United Theatre Ticket Offices v. Banton, supra; Ribnik v. McBride, 277 U. S. 350, 48 S. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327; Compare: Louisville & N. R. Co. v. Kentucky, 161 U. S. 677, 16 S. Ct. 714, 40 L. Ed. 849; Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. Chas. Wolff Packing Co. v.

Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280.

"Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, upon which the prosecution seems to lean rather heavily, deals with the suggested test—'whether the business is clothed or affected with a public interest'—and while it recognizes the impracticality of the formula, the technique employed leaves us in doubt whether the court intended to dismiss it altogether, (through the process of benevolent dispersion), and adopt a new liberalism toward governmental control of business, or to stick to the formula in a much expanded sense and give to the new adjustment between social demands and constitutional restraint the color of historic authenticity. Annotation 119 A. L. R. 985, 986."

The art of taking, making and selling photographs is an innocent occupation. It is claimed that it is an occupation wherein fraud and deception are peculiarly adaptable. However, it is obvious that all businesses have persons of deceptive traits yet the general laws appear adequate in connection with their inappropriate actions.

In the case of State v. Harris, supra, the court talked about the use of the police power over certain trades and occupations which tended to secure to those engaged in such trades the rights and powers of an exclusive and monopolistic nature and we subscribe to the reasoning. Quoting again from that case the following is observed:

"Statutes regulating trades and occupations by the delegation of governmental power to boards and commissions formed largely of the groups affected, intended primarily to control the personnel of the business, have become so common as to affect progressively and importantly the social and economic life of the State. A large number of laws of that character may be listed which not only regulate but organize into autonomous corporations occupations ranging from the learned professions to the ordinary trades. U. N. C. Law Review, Vol. 17, page 1.

"No independent administrative supervision is provided over

these organizations. No report of their activities is made to any responsible branch of the government. No audit is made by the State, except where items may incidentally affect the State Treasury. These matters are left to internal control. The organizations are, so to speak, legislatively launched and put on their own.

"The stage of internal protest has been reached. In marginal cases controversies in the courts have arisen as to whether the organization has captured a sufficient quantum of public purpose to operate as an agency of the government, or whether the police power of the State, ostensibly exercised for a public purpose, is not really farmed out to a private group to be used in narrowing the field of competition, or in aid of exploitation by creating remunerative positions in administration. Roach v. Durham, 204 N. C. 587, 169 S. E. 149; State v. Lawrence, 213 N. C. 674, 197 S. E. 586, 116 A. L. R. 1366. Without the aid of the statute these groups would be mere trade guilds, or voluntary business associations; with it they become State agencies, retaining, however, as far as possible, distinctive guild features. An exclusive self-governing status is achieved by the device of securing a majority membership on the administrative boards or commissions, and in aid of this the power of the State is heavily invoked by ways of prosecution in the criminal courts of those who are unable to secure the approval of the Board and obtain license to engage in the occupation.

"It is this power of exclusion of fellow workers in the same field that gives to the subject its social significance, and invites our most serious consideration of the constitutional guaranties of personal liberty and individual right called to our attention."

One of the principal elements of property is the right of alienation or disposition and restraint upon the right to alienate is generally regarded as contrary to public policy, 42 Am. Jur., Property, sec. 52, page 229; 73 C. J. S., Property, sec. 13, page 195. The discrimination between persons who wish to engage in photography as it is set up under the Act here in question is not in the interests of the general welfare but is solely for the

benefit of those in the legislative authorized monopoly. Such an arrangement is not based upon differences in the use or kind of property but is wholly arbitrary.

There is advanced the theory that the Act would protect the ██ public from the influence of pornographic pictures. The case of Territory v. Kraft, 33 Hawaii 397, 407, 408, has the following to say on this subject and is based upon good logic: "It is also contended by the Territory that unless the practice of photography as a commercial business is confined to those whose ethical qualifications are ascertained and certified by the board of examiners the public morals would be endangered by the taking and sale of lewd and lascivious pictures. If by the passage of Act 103 it had been in the mind of the legislature to protect the public against the evil influence of pornographic pictures it most certainly would not have confined the restrictions contained in the Act to those engaged in that vocation for profit but would have included amateur photographers as well, the activities of such photographers being potentially as harmful to the public morals as those of commercial photographers. The lawmaking body of course knew at the time Act 103 was passed that under the broad provisions of section 4420, R. L. 1925 (now sec. 5707, R. L. 1935), relating to obscene and other prohibited publications, the public was already safeguarded against such pictures and that further protection was unnecessary."

If it could be granted, which is doubtful, that the legislature ██ fixed a standard, that would be proper, yet it is obvious that the language of the statute gives the board unlimited authority in choosing who is qualified as a photographer and such an extension of authority is arbitrary and capricious and without constitutional logic.

The judgment of this court is that Chapter 37, Laws of 1937, violates sections 3 and 27 Article III of the Constitution of Montana and section 1 of the 14th Amendment to the Constitution of the United States.

The cause is reversed and is remanded to the district court with instructions to set aside the judgment entered against John

Gleason and enter a judgment dismissing the action and discharging the defendant.

MR. JUSTICES FREEBOURN and ANGSTMAN, concur.

MR. JUSTICE BOTTOMLY, dissents.